**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEE ANN NGIAN, Individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>          v.<br><br>FACEBOOK, INC. N/K/A META PLATFORMS, INC., MARK ZUCKERBERG, AND DAVID M. WEHNER,<br><br>          Defendants. | Case No. 1:21-cv-05976-MKB-RER<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Plaintiff Wee Ann Ngian ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's amended complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Facebook, Inc. ("Facebook" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff

1

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.　　This is a federal securities class action on behalf of all persons and entities who purchased the publicly traded securities of Facebook between November 3, 2016 and October 4, 2021, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.　　The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.　　This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.　　Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

5.　　In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Facebook's securities during the Class Period and was economically damaged thereby.

7.      Defendant Facebook n/k/a Meta Platforms, Inc. is the world's largest online social network, with 2.5 billion monthly active users. The Company is incorporated in Delaware and its principal executive offices are located at 1601 Willow Road, Menlo Park, CA 94025. Facebook securities are traded on NASDAQ under the ticker symbol "FB."

8.      Defendant Mark Zuckerberg ("Zuckerberg") has been the Chief Executive Officer ("CEO") of Facebook throughout the Class Period.

9.      Defendant David M. Wehner ("Wehner") has been the Chief Financial Officer ("CFO") of Facebook throughout the Class Period.

10.     Defendants Zuckerberg and Wehner are sometimes referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)      approved or ratified these statements in violation of the federal securities laws.

12.      The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.      The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14.      The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

### SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading Statements

15.      On November 3, 2016, Facebook filed with the SEC a Form 10-Q quarterly report for the quarter ended September 30, 2016 ("3Q 2016 10-Q"). The 3Q 2016 10-Q was signed by Defendant Wehner. Attached to the 3Q 2016 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

16.      The 3Q 2016 10-Q stated that, between September 30, 2013 and September 30, 2016, Facebook's monthly active users ("MAUs") grew from 199 million to 229 million in the United States and Canada. The 3Q 2016 10-Q also stated that, during the same time frame, Facebook's MAUs in Europe grew from 276 million to 342 million.

4

17.     The 3Q 2016 10-Q stated, in relevant part, the following about individuals with multiple accounts:

"We believe ***the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom*** and higher in developing markets such as India and Turkey."

(Emphasis added.)

18.     On February 2, 2017, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2016 ("2016 10-K"). The 2016 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2016 10-K were SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19.     The 2016 10-K stated that, between December 31, 2013 and December 31, 2016, MAUs in the United States and Canada grew from 201 million to 231 million. The 2016 10-K also stated that, in Europe during the same time frame, Facebook's MAUs grew from 282 million to 349 million.

20.     The 2016 10-K represented, in pertinent part, the following about individuals with multiple accounts:

"We believe ***the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom*** and higher in developing markets such as India and Turkey."

(Emphasis added.)

21.     On February 1, 2018, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2017 ("2017 10-K"). The 2017 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2017 10-K were SOX certifications signed by Defendants

Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

22.     The 2017 10-K represented that, between December 31, 2016 and December 31, 2017, MAUs in the United States and Canada grew from 231 million to 239 million. The 2017 10-K also represented that, during the same time frame, Facebook's MAUs in Europe grew from 349 million to 370 million.

23.     The 2017 10-K stated, in pertinent part, the following about individuals with multiple accounts:

> "We believe the **percentage of duplicate accounts is meaningfully higher in developing markets** such as India, Indonesia, and the Philippines, **as compared to more developed markets.**"

(Emphasis added.)

24.     On July 16, 2018, Facebook published on its website a statement titled, "Working to Keep Facebook Safe." In pertinent part, the statement said:

> "**It has been suggested that turning a blind eye to bad content is in our commercial interests. This is not true.** Creating a safe environment where people from all over the world can share and connect is core to Facebook's long-term success.

*      *      *

> **How We Create and Enforce Our Policies**

> More than 1.4 billion people use Facebook every day from all around the world. They post in dozens of different languages: everything from photos and status updates to live videos. Deciding what stays up and what comes down involves hard judgment calls on complex issues — from bullying and hate speech to terrorism and war crimes. **It's why we developed our Community Standards with input from outside experts** — including academics, NGOs and lawyers from around the world. We hosted three Facebook Forums in Europe in May, where we were able to hear from human rights and free speech advocates, as well as counter-terrorism and child safety experts.

These Community Standards have been publicly available for many years, and this year, for the first time, *we published the more detailed internal guidelines used by our review teams to enforce them.*

            \*      \*      \*

Reviewing reports quickly and accurately is essential to keeping people safe on Facebook. This is why we're doubling the number of people working on our safety and security teams this year to 20,000. This includes over 7,500 content reviewers. *We're also investing heavily in new technology to help deal with problematic content on Facebook more effectively. For example, we now use technology to assist in sending reports to reviewers with the right expertise, to cut out duplicate reports, and to help detect and remove terrorist propaganda and child sexual abuse images before they've even been reported.*"

(Emphasis added.)

25. On July 17, 2018, Facebook updated its "Working to Keep Facebook Safe" statement. The updated statement said, in relevant part:

"**Cross Check**
*We want to make clear that we remove content from Facebook, no matter who posts it, when it violates our standards. There are no special protections for any group — whether on the right or the left. 'Cross Check' — the system described in Dispatches — simply means that some content from certain Pages or Profiles is given a second layer of review to make sure we've applied our policies correctly.*

*This typically applies to high profile, regularly visited Pages or pieces of content on Facebook so that they are not mistakenly removed or left up.* Many media organizations' Pages — from Channel 4 to The BBC and The Verge — are cross checked. We may also Cross Check reports on content posted by celebrities, governments, or Pages where we have made mistakes in the past. For example, we have Cross Checked an American civil rights activist's account to avoid mistakenly deleting instances of him raising awareness of hate speech he was encountering.

*To be clear, Cross Checking something on Facebook does not protect the profile, Page or content from being removed. It is simply done to make sure our decision is correct.*

            \*      \*      \*

**Minors**
*We do not allow people under 13 to have a Facebook account.* If someone is is [sic] reported to us as being under 13, the reviewer will look at the content on their

7

profile (text and photos) to try to ascertain their age. If they believe the person is under 13, the account will be put on a hold and the person will not be able to use Facebook until they provide proof of their age. Since the program, we have been working to update the guidance for reviewers to put a hold on any account they encounter if they have a strong indication it is underage, even if the report was for something else.

(Emphasis added.)

26.     On January 31, 2019, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2018 ("2018 10-K"). The 2018 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2018 10-K were SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

27.     The 2018 10-K stated that, between December 31, 2017 and December 31, 2018, MAUs grew from 239 million to 242 million in the United States and Canada. The 2018 10-K also stated that, during the same time frame, Facebook's MAUs grew from 370 million to 381 million in Europe.

28.     The 2018 10-K stated, in pertinent part, the following about multiple accounts:

"We believe *the percentage of duplicate accounts is meaningfully higher in developing markets* such as the Philippines and Vietnam, *as compared to more developed markets.*"

(Emphasis added.)

29.     On January 29, 2020, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2019 ("2019 10-K"). The 2019 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2019 10-K were SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any

material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

30.     The 2019 10-K represented that, between December 31, 2018 and December 31, 2019, MAUs grew from 242 million to 248 million in the United States and Canada. The 2019 10-K also represented that, during the same time frame, Facebook's MAUs grew from 381 million to 394 million in Europe.

31.     The 2019 10-K stated, in relevant part, the following about multiple accounts:

"We believe ***the percentage of duplicate accounts is meaningfully higher in developing markets*** such as the Philippines and Vietnam, ***as compared to more developed markets.***"

(Emphasis added.)

32.     On January 27, 2021, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2020 ("2020 10-K"). The 2020 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2020 10-K were SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

33.     The 2020 10-K stated that, between December 31, 2019 and December 31, 2020, MAUs in the United States and Canada grew from 248 million to 258 million. The 2020 10-K also represented that, during the same time frame, Facebook's MAUs in Europe grew from 394 million to 419 million.

34.     The 2019 10-K stated, in pertinent part, the following about multiple accounts:

"We believe ***the percentage of duplicate accounts is meaningfully higher in developing markets*** such as the Philippines and Vietnam, ***as compared to more developed markets.***"

(Emphasis added.)

35.     The statements referenced in ¶¶15-34 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Facebook misrepresented its user growth; (2) Facebook knew, or should have known, that duplicate accounts represented a greater portion of its growth than stated, and it should have provided more detailed disclosures as to the implication of duplicate accounts to Facebook's user base and growth; (3) Facebook did not provide a fair platform for speech, and regularly protected high profile users via its Cross Check/XCheck system; (4) despite being aware of their use of Facebook's platforms, the Company failed to respond meaningfully to drug cartels, human traffickers, and violent organizations; (5) Facebook has been working to attract preteens to its platform and services; and (6) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Slowly Materializes and Leaks into Market and Causes Stock Price Declines**

36.     Facebook's undisclosed risks began to materialize and leak into the market as early as February 16, 2018. On that date, *The New York Times* published an article titled, "13 Russians Indicted as Mueller Reveals Effort to Aid Trump Campaign." The article revealed that the Russian intelligence agency Internet Research Agency paid Facebook for "politically themed ads."

37.     On February 17, 2018, *The New York Times* published an article titled, "To Stir Discord in 2016, Russians Turned Most Often to Facebook." In relevant part, the article stated:

> "In 2014, Russians working for a shadowy firm called the Internet Research
> Agency started gathering American followers in online groups focused on issues
> like religion and immigration. Around mid-2015, the Russians began buying digital

ads to spread their messages. A year later, they tapped their followers to help organize political rallies across the United States.

Their digital instrument of choice for all of these actions? *Facebook and its photo-sharing site Instagram.*

*The social network, more than any other technology tool, was singled out on Friday by the Justice Department when prosecutors charged 13 Russians and three companies for executing a scheme to subvert the 2016 election and support Donald J. Trump's presidential campaign.*

\*  \*  \*

*It is unprecedented for an American technology company to be so central to what the authorities say was a foreign scheme to commit election fraud in the United States.* The indictment further batters Facebook's image after it has spent months grappling with questions about how it was misused and why it did not act earlier to prevent that activity.

\*  \*  \*

*When suggestions first arose after the 2016 election that Facebook may have influenced the outcome, Mark Zuckerberg, the company's chief executive, dismissed the concerns.* But by last September, Facebook had disclosed that the Internet Research Agency had bought divisive ads on hot-button issues through the company. It later said 150 million Americans had seen the Russian propaganda on the social network and Instagram.

\*  \*  \*

Yet *Facebook's multiple mentions in Friday's indictment renew questions of why the world's biggest social media company didn't catch the Russian activity earlier or do more to stop it.* How effective the company's new efforts to reduce foreign manipulation have been is also unclear.

\*  \*  \*

*At every step, the Russians used Facebook's own tools to make sure their propaganda was as effective as possible.* Those tools allowed them to get real-time results on which types of ad campaigns were reaching their target audience or which posts were getting the most engagement with viewers.

*Researchers said that those tools are still widely available and that while the company has worked to remove fake accounts and stem the flow of disinformation, it has refused to let outside researchers examine the data on how Russian actors used the platform so effectively.*

11

(Emphasis added.)

38.    As a result of the articles, Facebook share prices fell $3.22 between February 16, 2018 and February 20, 2018, the next trading day. This drop equated to a market cap decline of $4 billion. However, instead of coming clean about their failings, Facebook continued to mislead the public regarding abuses on the Company's platforms.

39.    On March 12, 2018, *Reuters* published an article titled, "U.N. investigators cite Facebook role in Myanmar crisis". The article said, in relevant part:

> "U.N. human rights experts investigating a possible genocide in Myanmar said on Monday that Facebook had played a role in spreading hate speech there.
>
> *        *        *
>
> Marzuki Darusman, chairman of the U.N. Independent International Fact-Finding Mission on Myanmar, told reporters that ***social media had played a "determining role" in Myanmar***.
>
> "It has ... substantively contributed to the level of acrimony and dissension and conflict, if you will, within the public. Hate speech is certainly of course a part of that. ***As far as the Myanmar situation is concerned, social media is Facebook, and Facebook is social media***," he said.
>
> U.N. Myanmar investigator Yanghee Lee ***said Facebook was a huge part of public, civil and private life, and the government used it to disseminate information to the public.***
>
> ***"Everything is done through Facebook in Myanmar,"*** she told reporters, adding that Facebook had helped the impoverished country but had also been ***used to spread hate speech.***
>
> "It was used to convey public messages but we know that the ultra-nationalist Buddhists have their own Facebooks and are really ***inciting a lot of violence and a lot of hatred against the Rohingya or other ethnic minorities***," she said."

(Emphasis added.)

40.     As a result of the *Reuters* article, Facebook share prices fell $2.88 between March 12, 2018 and March 19, 2018, equating to a market cap decline of $3.8 billion. But rather than addressing the Company's shortcomings, Facebook continued to mislead investors.

41.     On October 31, 2019, *BBC* released an article titled, "Slave markets found on Instagram and other apps". The article, in pertinent part, reported:

> "An undercover investigation by BBC News Arabic has found that ***domestic workers are being illegally bought and sold online in a booming black market.***
>
> Some of the trade has been ***carried out on Facebook-owned Instagram, where posts have been promoted via algorithm-boosted hashtags, and sales negotiated via private messages.***
>
> *       *       *
>
> ***"What they are doing is promoting an online slave market,"*** said Urmila Bhoola, the UN special rapporteur on contemporary forms of slavery.
>
> *       *       *
>
> The illegal sales are a clear breach of the US tech firms' rules for app developers and users.
>
> However, the BBC has found there are ***many related listings still active on Instagram***, and other apps available via Apple and Google.
>
> *       *       *
>
> Apps including 4Sale and ***Instagram enable employers to sell the sponsorship of their domestic workers to other employers, for a profit. This bypasses the agencies, and creates an unregulated black market which leaves women more vulnerable to abuse and exploitation.***
>
> This online slave market is not just happening in Kuwait.
>
> In Saudi Arabia, the investigation found hundreds of women being sold on Haraj, another popular commodity app. There were ***hundreds more on Instagram, which is owned by Facebook.***
>
> (Emphasis added.)

13

42. On this news, Facebook share prices dropped by $5.05 on October 31, 2019, equating to a market cap decline of $14 billion. However, Facebook continued to mislead the investing public regarding its business operations.

43. On September 13, 2021, during trading hours, *The Wall Street Journal* ("WSJ") published an article titled "Facebook Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's Exempt." It would be the first of nine articles published by the WSJ based on documents provided by a then-unknown whistleblower (the "Whistleblower"). The article stated, in relevant part:

> ***Mark Zuckerberg has publicly said Facebook Inc. allows its more than three billion users to speak on equal footing with the elites of politics, culture and journalism, and that its standards of behavior apply to everyone, no matter their status or fame.***
>
> ***In private, the company has built a system that has exempted high-profile users from some or all of its rules***, according to company documents reviewed by The Wall Street Journal.
>
> The program, known as "cross check" or "XCheck," was initially intended as a quality-control measure for actions taken against high-profile accounts, including celebrities, politicians and journalists. ***Today, it shields millions of VIP users from the company's normal enforcement process***, the documents show. ***Some users are "whitelisted"—rendered immune from enforcement actions—while others are allowed to post rule-violating material pending Facebook employee reviews that often never come.***
>
> *       *       *
>
> A 2019 internal review of Facebook's whitelisting practices, marked attorney-client privileged, found ***favoritism to those users to be both widespread and "not publicly defensible."***
>
> ***"We are not actually doing what we say we do publicly,"*** said the confidential review. It called the company's actions "a breach of trust" and added: ***"Unlike the rest of our community, these people can violate our standards without any consequences."***
>
> *       *       *

14

*For ordinary users, Facebook dispenses a kind of rough justice in assessing whether posts meet the company's rules* against bullying, sexual content, hate speech and incitement to violence. Sometimes the company's automated systems summarily delete or bury content suspected of rule violations without a human review. At other times, material flagged by those systems or by users is assessed by content moderators employed by outside companies.

*       *       *

*Users designated for XCheck review, however, are treated more deferentially.* Facebook designed the system to minimize what its employees have described in the documents as "PR fires"—negative media attention that comes from botched enforcement actions taken against VIPs.

If Facebook's systems conclude that one of those accounts might have broken its rules, they don't remove the content—at least not right away, the documents indicate. They route the complaint into a separate system, staffed by better-trained, full-time employees, for additional layers of review.

(Emphasis added).

44.     On this news, Facebook shares dropped by $5.17 to close at $376.51 on September 13, 2021, equating to a market cap decline of $14 billion.

45.     On September 28, 2021, during market hours, the WSJ published an article titled, "Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show." The article said, in pertinent part:

*Internal Facebook documents reviewed by The Wall Street Journal show the company formed a team to study preteens, set a three-year goal to create more products for them and commissioned strategy papers about the long-term business opportunities presented by these potential users.* In one presentation, it contemplated whether there might be a way to engage children during play dates.

*"Why do we care about tweens?" said one document from 2020. "They are a valuable but untapped audience."*

*       *       *

On Monday, *Adam Mosseri, head of Instagram, said the company would pause the development of a version of the app for children, often referred to as Instagram Kids.* He said the company wanted time to talk to parents, experts and lawmakers before proceeding. He also contended that underage users would simply

15

lie about their age to access Instagram if a version for children under the age of 13 wasn't available.

\*       \*       \*

***Over the past five years, Facebook has made what it called "big bets" on designing products that would appeal to preteens across its services, according to a document from earlier this year.***

***In more than a dozen studies over that period, the documents show, Facebook has tried to understand which products might resonate with children and "tweens" (ages 10 through 12)***, how these young people view competitors' apps and what concerns their parents.

"With the ubiquity of tablets and phones, kids are getting on the internet as young as six years old. We can't ignore this and we have a responsibility to figure it out," said a 2018 document labeled confidential. "Imagine a Facebook experience designed for youth."

***Earlier this year, a senior researcher at Facebook presented to colleagues a new approach to how the company should think about designing products for children. It provided a blueprint for how to introduce the company's products to younger children.*** Rather than offer just two types of products—those for users 13 and older, and a messenger app for kids—Facebook should tailor its features to six age brackets, said a slide titled "where we've been, and where we're going."

\*       \*       \*

In a study about household dynamics, a Facebook user-experience researcher found that although teens often inspired their younger relatives to join Instagram, those same teens also often counseled the tweens not to share too frequently, and not to post things they would later regret.

"I don't know how to get a perfect picture like my sister says you need to post," a tween told the researcher.

***"We need to understand if this influence over preteen sharing holds at scale," the researcher wrote in a document posted to Facebook's internal message board early this year. "If it is common that teens are discouraging preteens from sharing, there are obvious implications for creation and the ecosystem both in the near and longer-term*** as preteens are the next generation coming onto the platform." The presentation cited concern among teenagers about oversharing as a "myth" about Instagram.

(Emphasis added.)

16

46.     On this news, Facebook share prices dropped $7.32 to close at $340.65 on September 28, 2021, equating to a market cap decline of $20 billion.

47.     On October 3, 2021, CBS News aired a television segment on *60 Minutes* interviewing the Whistleblower, revealed to be Frances Haugen, on her findings during her time at Facebook. On that same day, CBS published an article containing highlights from the interview, stating in relevant part:

> "The thing I saw at Facebook over and over again was there were conflicts of interest between what was good for the public and what was good for Facebook," Haugen said. "***And Facebook, over and over again, chose to optimize for its own interests, like making more money.***"
>
> *     *     *
>
> Haugen told 60 Minutes that weeks after the 2020 election, Facebook dissolved a department called "Civic Integrity" which worked on risks to elections including misinformation.
>
> "Like, they basically said, 'Oh good, we made it through the election. There wasn't riots. We can get rid of Civic Integrity now,'" Haugen said. "Fast forward a couple months, we got the insurrection. And when they got rid of Civic Integrity, it was the moment where I was like, ***'I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous.'***"
>
> *     *     *
>
> Haugen said Facebook's algorithm optimizes for content that generates engagement. That's led to publishers, "realizing that if they produce more content that is angry and divisive and polarizing, they'll get more views," in her words.
>
> ***"Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money,"*** Haugen added.
>
> (Emphasis added.)

48.     On October 4, 2021, CBS News published an article titled, "Whistleblower's SEC Complaint: Facebook Knew Platform Was Used to 'Promote Human Trafficking and Domestic Servitude'", containing the whistleblower complaints against Facebook filed with the SEC. There

were eight complaints shared in the CBS article. The whistleblower complaints against Facebook,

which the CBS News article discussed, contained the following allegations:

     a.   Facebook knew its platforms perpetuated misinformation, but did little to stop it.

        In relevant part, this complaint alleged:

Facebook misled investors and the public about its role perpetuating misinformation and violent extremism relating to the 2020 election and January 6th insurrection.

*      *      *

Facebook made misstatements and omissions regarding its facilitation of political misinformation, including in testimony before Congress.

*      *      *

***Facebook only actions less than 1% of Violence and Inciting to Violence (V&I) content on Facebook*** – Facebook's strategy of focusing on Content over other solutions lets this content effectively run free[.]

*      *      *

***Facebook has demonstrated via experiments using brand new test accounts how rapidly Facebook's algorithms can veer people interested in Conservative topics into radical or polarizing ideas and groups/pages***, some demonstrating traits of Coordinated Inauthentic Behavior (CIB) akin to what was seen by the Macedonians in 2016[.]

*      *      *

***Pages that repeat offend for misinformation are permitted to continue to spread misinformation***[.]

*      *      *

Facebook has ***"whitelisted" political users who violate its terms, leading to the spread of misinformation and violence*** on and off the platform.

(Emphasis added.)

     b.   Facebook did little to combat human traffickers using its platform. In pertinent part, this complaint said:

18

Facebook misled investors and the public about its promotion of human trafficking / slaver / servitude.

\*      \*      \*

***Internal company documents show that Facebook and Instagram were, and are, being used to promote human trafficking and domestic servitude.*** An internal Facebook record created no later than April 2019 states: ***"We have observed increasing number of reported content that indicates that the platform is being used to coordinate and promote domestic servitude*** . . . real world harm caused by domestic servitude as well as risk to the business due to potential PR fires . . ."

\*      \*      \*

Notably, there was widespread media coverage of an "undercover investigation by BBC News Arabic" in or around October 2019, which found that ***"domestic workers are being illegally bought and sold online in a booming black market . . . on Facebook-owned Instagram, where posts have been promoted via algorithm-boosted hashtags, and sales negotiated via private messages."***

\*      \*      \*

***However, even after this news coverage, Facebook's regular SEC filings continually omitted specific references to trafficking, domestic servitude, human slavery, and the Apple App Store escalation.***

In fact, Facebook's failure to solve human trafficking and servitude on its platforms threatened its distribution on the Apple App Store. Moreover, as the enclosed Facebook records show, Facebook's statements about human trafficking were false. For example, ***Facebook has confirmed:*** [. . .] ***[W]e received communication from Apple where the company threatened to pull FB & IG from its App Store due to them identifying content promoting 'domestic servitude'.*** . . [. . .] However, due to the underreporting of this behaviour and absence of proactive detection, ***newly created and existing content not captured in the IG sweep meant that domestic servitude content remained on the platform.*** [. . .] ***Was this issue known to Facebook before BBC enquiry and Apple escalation? Yes.*** [. . .] ***[O]ur platform enables all three stages of the human exploitation lifecycle (recruitment, facilitation, exploitation)***[.]"

(Emphasis added.)

    c. Confirming the earlier WSJ article, Facebook's XCheck program gave preferential treatment to certain users. In relevant part, this complaint said:

Facebook misled investors and the public about equal enforcement of its terms given that high-profile users are "whitelisted" under its "XCheck" program.

*     *     *

**[O]ver the years, many XChecked people & entities have been exempted from enforcement. That means, for a select few members of our community, we are not enforcing our policies and standards.** Unlike the rest of our community, these people can violate our standards without any consequences[.]

*     *     *

We are exempting certain people and businesses from our policies and standards [. . .] **This undermines our fairness and legitimacy efforts; creates legal and compliance risks for the company . . . Based on an initial company-wide audit, this problem is pervasive across the country[.]**

(Emphasis added.)

    d.   Facebook misled investors and the public the extent to which Facebook was used to foment ethnic violence and global division. In relevant part, this complaint revealed:

Facebook misled investors and the public about bringing "the world closer together" where it relegates international users and promotes global division and ethnic violence.

*     *     *

[. . .] **Facebook's shareholders proposed having a human/civil rights expert on the board, stating:**

"In September 2020, **a Facebook employee reported Facebook ignored global political manipulation from foreign governments seeking to 'abuse our platform on vast scales to mislead their own citizenry.'** [. . .]

Children's rights organization Plan International found **online attacks against girls globally are most prevalent on Facebook.**

*     *     *

**In Myanmar, where violence against the Rohingya 'bears the hallmarks of genocide,' a Facebook commissioned human rights report showed the company 'created an enabling environment.' In Ethiopia, Facebook's platform amplified ethnic tensions and calls for genocide, inciting violence.**

20

***In rejecting that shareholder proposal, Facebook represented:***

"We recognize the need to protect and respect both civil and human rights and we have made, and continue to make, significant progress on both of these fronts and fight abuse across our services. ***We believe that implementing this proposal is unnecessary because of our continued progress in this area and our efforts to fight abuse across our services***. . ."

*     *     *

***FIRST, Facebook Lacks Adequate Resources for International Issues.***

*     *     *

Global Remit [n.b. budget] "US – 87%, ROW [Rest of World] (India, France, Italy) – 13%.

*     *     *

***SECOND, Documents Show that Facebook's Language Capabilities are Inadequate, Leading to Global Misinformation and Ethnic Violence.***

[. . .] Facebook documentation outlines:

[. . .] ***[I]n the Afghanistan market, the action rate for Hate Speech is worryingly low at 0.23 per cent[.]***

*     *     *

In particular, Facebook's written translations (in limited languages) do not account for regions where significant users cannot read.

*     *     *

Nor do they appropriately manage different dialects:

"Arabic is not one language, truly, rather it is better to consider it a family of languages – many of which are mutually incomprehensible . . . [in other dialects] ***they will still misunderstand cultural or contextual content, which is key to problem areas such as Hate Speech and even Terrorism.*** [. . .] [A]s every Arabic nation save Western Sahara is on the At-Risk Countries list and ***deals with such severe issues as terrorism and sex trafficking--it is surely of the highest importance to put more resources to the task of improving Arabic systems.***"

*     *     *

21

***THIRD, Documents Confirm That Facebook's Actions and Choices Facilitated Harmful Content and Misinformation Around the World***

\*       \*       \*

"***40% of Sampled Top VPV [View Port Views] Civic Posters in West Bengal Were Fake/Inauthentic.*** [. . .] The message comes to dominate the ecosystem with over 35% of members having been recommended a cell group by our algorithms."

\*       \*       \*

"***Hate Speech Classifier[s] for Myanmar/Burmese . . . hate speech text classifier . . . currently being used in production / being maintained? . . . it doesn't look like it's currently in use?***"

(Emphasis added.)

> e.  Facebook was inflating its advertising reach and user base in key demographics.

> This complaint alleged, in pertinent part:

For years, Facebook has misled investors and advertisers about shrinking user base in important demographics, declining content production, and the true number of recipients of "Reach & Frequency" advertising[.]

\*       \*       \*

[. . .] ***Facebook has failed to disclose internal data showing a contraction of the user base in important demographics, including American teenagers and young adults. The company has also hidden the extent to which content production per user has been in long-term decline.***

\*       \*       \*

Internal documents show that youth and teens, a crucial demographic for advertisers, are deliberately targeted for Instagram in order to bring their family members onto Facebook platforms:

"Teens shape the household's perception of Instagram. [. . .] Family-first acquisition strategies are proven effective (e.g. TikTok) and warrant exploration on IG [Instagram]."

\*       \*       \*

***Facebook is inflating it's [sic] growth numbers by not disclosing that a higher fraction of teen accounts are "Same User with Multiple Accounts" (SUMAs), or duplicate accounts.*** In terms of teen users, records indicate:

***"Over 15% of new teen accounts are existing users creating a SUMA child [secondary] account."***

***Internal records confirm how teens and young adults in more developed economies are using the platform less.***

"Facebook's teen and young adult DAU [Daily Active Users] has been in decline since 2012/2013. [. . .]"

"***The United States is among the first countries where we observed teen MAP [Monthly Active People] decline, starting in 2012*** . . . teens have been taking longer to adopt Facebook . . . One immediately concerning takeaway . . . is a flattening growth trends for cohorts below 18 years[.]"

\*    \*    \*

***Although Facebook has sophisticated algorithms to assess the existence of SUMAs / duplicate accounts, Facebook is well aware that its failure to include SUMA duplicate accounts distorts its Reach & Frequency (R&F) advertising models***:

"Previous analysis have [sic] shown that including SUMA modeling into audience sizes would ***reduce overestimation of population in age groups for our top 30 ad markets by 50% when included by itself and by 63% when included in conjunction with age modeling.***"

By delivering too many ads to users that the advertisers did not want to pay for, ***Facebook overcharged advertisers on a vast scale***:

"But wont' [sic] this cause the R&F [reach and frequency] to violate their contract? ***If the ads is [sic] targeted to 1M accounts with a guarantee of 90%, and we deliver to 900k accounts but only 800k users [due to SUMA], wont' [sic] this make R&F [reach and frequency] pay penalty if we report 800k as coverage?***["]

(Emphasis added.)

49.     As a result of the October 3 and 4 revelations, Facebook's share price dropped

$16.78 per share, or approximately 4.9%, from closing at $343.01 on October 1, 2021, the prior

trading day, to close at $326.23 on October 4, 2021, equating to a market cap decline of $47 billion.

50.     From the first WSJ article published on September 13, 2021, to the final disclosure on October 4, 2021, Facebook share prices fell by $55.45, or over 14%, damaging investors.

51.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the publicly traded securities of Facebook during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

58.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

59.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

60.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

63.      During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff

27

and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

65.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

66.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

67.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially

inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

68.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

69.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

70.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

71.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

73.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the

29

Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

74.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

75.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

76.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

30

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: December 17, 2021                    Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            By: /s/ Phillip Kim
                                            Phillip Kim, Esq. (PK 9384)
                                            Laurence M. Rosen, Esq. (LR 5733)
                                            275 Madison Ave., 40th Floor
                                            New York, NY 10016
                                            Tel: (212) 686-1060
                                            Fax: (212) 202-3827
                                            Email: pkim@rosenlegal.com
                                            Email: lrosen@rosenlegal.com


                                            *Counsel for Plaintiff*